# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Corrina Weidow and Kerry Bentler   : <br> 909 Matthew Avenue   : <br> Scranton, PA 18510   : <br>   : <br> Planitiffs   : <br>   : <br> v.   : <br> Scranton School District | **CIVIL ACTION** <br><br> NO.: 08-1978 <br><br> (Judge    ) <br><br> **JURY TRIAL DEMANDED** |

FILED
SCRANTON

OCT 3 1 2008

PER_____

## **COMPLAINT**

## I.   **NATURE OF THIS ACTION**

1.    Plaintiff Corrina Weidow and her mother, Plaintiff Kerry Bentler, assert claims for damages and a trial by jury against defendant Scranton School District (SSD) arising from violations of § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Rehabilitation Act"), and the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. ("ADA"). Specifically, defendant SSD violated the ADA and §504 of the Rehabilitation Act by (1) being deliberately indifferent to Corrina's complaints of disability-related harassment at the hands of her peers such that she was subject to a hostile educational environment because of her disability and (2) by continually failing to identify and evaluate Corrina as a student with a disability under § 504 of the Rehabilitation Act and the

Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), thus denying her a "free and appropriate public education." Defendant SSD violated the Equal Protection Clause of the Fourteenth Amendment by intentionally and arbitrarily denying Corrina a "free and appropriate public education" under IDEA and instead requiring her to attend school at home, unlike similarly situated students. Defendant also violated Kerry Bentler's 14th Amendment fundamental liberty interest in providing for care and guidance related to Corrina's education.

## II.    JURISDICTION AND VENUE

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and § 1343, and the aforementioned statutory provisions. Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to hear and adjudicate state law claims.

3.      Venue is proper in this Court as the unlawful practices alleged herein were committed within the jurisdiction of this Court.

4.      Plaintiffs are not required to exhaust administrative remedies under §504 of the Rehabilitation Act and Title II of the ADA.

### III.  **PARTIES**

5.      Plaintiff, Corrina Weidow, date of birth May 18, 1990, is an adult person who resides with her mother Ms. Kerry Bentler at 909 Matthew Avenue, Scranton, Pennsylvania 18510. At all times relevant hereto, Corrina resided and continues to reside within the Scranton School District.

6.      Ms. Bentler is an adult person residing at 909 Matthew Avenue, Scranton, Pennsylvania 18510 and at all times relevant hereto was the mother and guardian of Corrina, who at the time of the events alleged in this complaint was a minor.

7.      The Scranton School District (hereinafter referred to as "SSD") is a governmental entity. Pursuant to state law and with a receipt of federal funds, the SSD provides education services to school aged children residing in the city of Scranton.

### IV.  **STATEMENT OF THE FACTS**

8.      Corrina was diagnosed with bipolar disorder in May 2004 by Dr. Matthew Berger.

9.      At all relevant times hereto, Corrina was an individual with a disability in that she was and continues to be "substantially limited in one or more major life activities" as defined by both the ADA and the Rehabilitation Act. Corrina has difficulty forming and maintaining

relationships with her peers and others and has an intense fear of being touched. In addition, Corrina has a record of such impairment and is regarded by defendant as disabled.

10.    Corrina is "otherwise qualified" to participate in normal school activities. Corrina has passed every class in high school except Algebra I, which she failed in ninth grade due to the symptoms of her illness. With the exception of ninth grade, Corrina has made the honor roll every year throughout high school.

11.    Corrina began taking Zoloft, an antidepressant, Geodon, an antipsychotic, and Lamictal, an anticonvulsant. All of these medications were prescribed by Dr. Berger to treat Corrina's bipolar disorder.

12.    At all times relevant hereto, Corrina was an enrolled student in the SSD, and was a minor until her 18th Birthday, May 8, 2008.

13.    In August 2004, Kerry Bentler enrolled Corrina in West Scranton High School, part of SSD, for ninth grade.

14.    SSD is obligated to identify and evaluate all students who may be in need of special education and related services under §504 of the Rehabilitation Act and IDEA and must provide those found to be eligible with appropriate educational and related services.

4

15.     In August 2004, prior to the start of classes, Ms. Bentler informed West Scranton guidance officer Mary Suchowski and school nurse Judy Gatelli that Corrina was bipolar.

16.     Despite having knowledge that Corrina was bipolar, SSD did not identify and refer Corrina for an evaluation.

17.     In or around November 2004, Corrina was found cutting herself with a razor in the school bathroom by another student, who notified English teacher Natalie Colosimo. Ms. Colisimo escorted Corrina to the nurse on duty, Ms. Marichak.

18.     Rather than immediately notifying Ms. Bentler or obtaining medical services for Corrina, Ms. Marichak asked one of Corrina's friends to drive her home. The nurse then phoned Ms. Bentler to tell her that a student was bringing Corrina home.

19.     Notwithstanding this very clear indication of a mental disability, the SSD did not convene a meeting or take any meaningful action to consider evaluating Corrina.

20.     In or around December of 2004, Kerry Bentler received a call from West Scranton High School Principal Kevin Rogan ("Principal Rogan") that school resource officer Jeff Gilroy ("Officer Gilroy") had obtained a note containing violent threats directed towards Corrina.

21.    Ms. Bentler went to the school to meet with Principal Rogan and Principal Rogan allowed Ms. Bentler to read the note.

22.    The note, written by Maryann Herne, contained graphic, violent threats directed towards Corrina.

23.    Maryann was made aware of Corrina's mental disability through her cousin Jay Unger. Jay was Corrina's former boyfriend.

24.    Ms. Herne was suspended as a result of the note.

25.    After school that day, Corrina was confronted by Ms. Herne and a group of her friends in the West Scranton High School parking lot. Maryann and her friends proceeded to taunt and threaten Corrina.

26.    Officer Gilroy, who was present during the incident, told Maryann and her friends to leave and ordered Corrina to accompany him back into the school.

27.    Corrina objected to Officer Gilroy's directive, stating that Ms. Bentler had told her to wait for her in the parking lot and that she was not doing anything wrong.

28.    Office Gilroy placed his hands on Corrina and told her that she was being disobedient and that he would arrest her if she did not follow him back to the school.

29.     Corrina informed Officer Gilroy that she had bipolar disorder and told him not to touch her because her disability makes her afraid of being touched.

30.     Officer Gilroy then forced Corrina to the ground and placed her in handcuffs, stating that he had to "make an example of her to the other students watching."

31.     Office Gilroy escorted Corrina to Principal Rogan's office, who called Ms. Bentler to tell her to come to the school.

32.     A short time after the incident with the note, Mrs. Herne, confronted Corrina in a school hallway and called her a "little bitch." Mr. Monk then grabbed Corrina, pressed her against a locker, and threatened her.

33.     Vice Principal Jessica Finnerty, who had witnessed Mr. Monk grab and threaten Corrina, escorted Corrina to her office, whereupon she called Ms. Bentler to notify her of the incident.

34.     Ms. Bentler arrived at the school and spoke with Principal Rogan, who assured her that the school would press charges against Mrs. Herne and Mr. Monk.

35.     Despite Principal Rogan's assurances, neither Ms. Bentler nor Corrina was contacted for follow-up regarding the incident.

36.     In or around late December 2004, Kerry Bentler was forced to enroll Corrina in a school outside of the SSD because the district failed to identify Corrina as a student with a disability or provide any reasonable accommodations for her disability.

37.     In August 2005, Kerry Bentler enrolled Corrina in Scranton High School, part of the SSD, for tenth grade. Ms. Bentler informed Corrina's guidance counselor, Kristie McDowall ("Counselor McDowall"), that Corrina had bipolar disorder. She also informed Ms. McDowall of Corrina's problems at West Scranton High School and her history of self-mutilation. Furthermore, Ms. Bentler called the school nurse to inform her of Corrina's condition and noted it on her medical information card.

38.     On her first day of tenth grade, Corrina was placed in English-as-a-Second-Language ("ESL") classes by Scranton High School despite the fact that English is Corrina's native language. One of Corrina's friends was in her ESL class. That student's native language is English and he is also bipolar.

39.     On Corrina's second day, Ms. Bentler called Ms. McDowell about Corrina's placement in ESL classes. Ms. McDowell corrected Corrina's schedule without providing a reason for why she was placed in ESL courses, despite Ms. Bentler's requests for an explanation.

40.     During tenth grade, Corrina was harassed by other students who would follow her to her locker, threaten to assault her, and taunt her by calling her, among other things, "bipolar" and "psychotic bitch."

41.     Corrina frequently stayed home from school throughout the tenth grade because the harassment caused her high anxiety and vomiting.

42.     Ms. Bentler would regularly call Scranton High School vice principal, Melissa Rose ("Vice Principal Rose"), to notify her that Corrina was being harassed because of her disability.

43.     Despite Vice Principal Rose's frequent assurances that she would talk to the students who harassed Corrina, the taunts and threats continued unabated.

44.     In the fall semester of tenth grade, Ms. Bentler and Corrina met with Corrina's teacher Mr. Scotleski, and Counselor McDowall to discuss changes in Corrina's bipolar medication.

45.     Head Guidance Counselor McNulty briefly attended this meeting before it ended.

46.     At no point in time did Head Guidance Counselor McNulty or Counselor McDowall offer to evaluate Corrina for eligibility under § 504 of the Rehabilitation Act or IDEA, despite their knowledge of Corrina's disability.

47.     Also in the fall of 2005, Ms. Herne confronted Corrina at the Scranton High School entrance. She took off her shirt and gestured to fight with Corrina, saying to her friends "that's the girl we're going to get."

48.     Ms. Bentler called Vice Principal Rose to report the incident. Vice Principal Rose told Ms. Bentler that she would speak with Ms. Herne.

49.     Ms. Bentler's call to Principal Robert McTiernan ("Principal McTiernan") regarding the incident was not returned.

50.     Due to Corrina's stress and anxiety resulting from these incidents, Corrina began experiencing insomnia. Dr. Berger prescribed Corrina Rozerem, a sedative, to help her sleep.

51.     On or around February 16, 2006, Ms. Bentler called the Lackawanna County District Attorney's office because of her concern that the SSD was not doing enough to respond to Corrina's complaints of peer-on-peer harassment.

52.     On February 21, 2006, Corrina and Ms. Bentler met with Vice Principal Rose, Scranton High School Resource Officer John Burgette, and Christine Adams, a representative from the Lackawanna County District Attorney's office.

53.     Ms. Adams advised Vice Principal Rose and Officer Burgette that the SSD needed to take the threats made against Corrina more seriously.

54.     Vice Principal Rose told Corrina to locate Officer Burgette when other students harassed her.

55.     Subsequent to the meeting, Corrina attempted to follow Vice Principal Rose's instruction by contacting Officer Burgette when other students harassed her.

56.     However, this policy was inadequate because approximately nineteen-hundred students attend Scranton High School and Corrina was thus frequently unable to locate Officer Burgette when she was being harassed.

57.     In the fourth quarter of tenth grade, Ms. Bentler and Corrina met with Corrina's teacher, Mr. Thomas, and Counselor McDowall to discuss changes in Corrina's bipolar medication.

58.     Because the SSD has no policy to accommodate students with mental illnesses when they suffer symptoms in the classroom, Mr. Thomas advised Corrina to leave his classroom and walk around the school to calm down when she experienced symptoms in his class.

59.     The head of the guidance counseling department, Barbara McNulty ("Head Guidance Counselor McNulty"), briefly attended the meeting before it ended.

60.     At no point in time did Head Guidance Counselor McNulty or Counselor McDowall offer to evaluate Corrina for eligibility under § 504 of the Rehabilitation Act or IDEA, despite their knowledge of Corrina's disability.

61.     Also in the fourth quarter of tenth grade, Corrina and Ms. Bentler met with Vice Principal Rose and Corrina's art teacher, Ms. Gentile. Ms. Bentler informed Ms. Gentile and Vice Principal Rose that Corrina had bipolar disorder.

62.     The SSD once again failed to identify and evaluate Corrina.

63.     Corrina continued to be taunted and threatened by other students on the basis of her disability throughout tenth grade.

64.     On or around August 28, 2006, Corrina returned to Scranton High School for eleventh grade.

65.     Prior to her return, Brian McGraw ("Principal McGraw"), became the acting principal at Scranton High School.

66.     Corrina again endured harassment by students who would call her "psychotic bitch" and "bipolar," stand in front of her locker so she could not access it, and put threatening notes in her locker.

67.     Corrina became fearful and anxious of going to school.

68.    Ms. Bentler again called Vice Principal Rose to notify her of the harassment. Vice Principal Rose instructed Corrina to go to a hall monitor to help her get to her locker.

69.    However, hall monitors were not always available to accompany Corrina to her locker and she continued to be harassed.

70.    On or around September 11, 2006, Corrina stopped going to school because she feared for her safety.

71.    On or around September 11, 2006, because the SSD failed to accommodate Corrina in any way, and her mother Kerry Bentler was forced to request the services of a homebound instructor.

72.    Mrs. Lee Carr ("Supervisor Carr"), supervisor of special education for Scranton High School, told Ms. Bentler that obtaining a homebound instructor for Corrina would be "too much paperwork" and instructed her to pick up Corrina's assignments from school.

73.    Ms. Bentler went to Scranton High School every other day to pick up work for Corrina but there was never any work available.

74.    Ms. Bentler called Ms. McDowall to request Corrina's work from her teachers.

75.    Mrs. McDowell was only able to get work from Corrina's Spanish and math teachers.

76.     After numerous calls to Supervisor Carr, Corrina was assigned a homebound instructor, Laura Stefonetti in late October 2006, in the second quarter of Corrina's junior year.

77.     At no time prior to being placed in homebound instruction was Corrina evaluated for possible reasonable accommodations under the ADA or educational services under IDEA.

78.     Neither Corrina nor Ms. Stefonetti received any work aside from math and Spanish from Scranton High School for several weeks after Ms. Stefonetti was assigned to instruct Corrina.

79.     Ms. Stefonetti spoke with Mr. Bill King ("Assistant King"), assistant to the Superintendent about her inability to get Corrina's assignments.

80.     Corrina and Ms. Stefonetti were still unable to get Corrina's assignments from her teachers.

81.     With permission from Assistant King, Ms. Stefonetti was able to get the same curricular assignments that Corrina was supposed to be given from teachers at West Scranton High School.

82.     Ms. Stefonetti experienced no delay in retrieving these assignments.

83.     Corrina taught herself her Spanish assignments because Ms. Stefonetti was not qualified to teach Spanish and the Scranton School District did not provide Corrina with a Spanish-speaking instructor for the course.

84.     Because Corrina was not assigned a homebound instructor until late October 2006, she was forced to complete her first quarter assignments concurrently with her second quarter assignments, causing her stress and anxiety.

85.     On February 27, 2007, Corrina attended Scranton High School's annual semi-formal dance.

86.     At the February 27th dance, Corrina and her date were harassed by the same students whose actions caused Corrina to stop going to class. The students convinced Corrina's date to break-up with her by telling him that Corrina was "psychotic" and "crazy."

87.     Due to the harassment, Corrina had a panic attack, causing her to vomit on the dance floor and dig her nails into her shoulders so hard that she broke the skin.

88.     Corrina, having difficulty breathing due to the panic attack, went to the bathroom with a friend. A teacher, acting as a chaperone, was in

the bathroom and noticed Corrina was having difficulty breathing. To assist Corrina, the teacher offered her an inhaler.

89.     On or around February 28, 2007, Ms. Bentler called Principal McGraw to inform him of the events that occurred at the Feb. 27th dance.

90.     Principal McGraw told Ms. Bentler that he had not been informed about the events and that "she [Corrina] is homebound, so she's okay, she won't see them."

91.     Despite his knowledge, Principal McGraw did not refer Corrina for an evaluation, discipline the students who harassed Corrina at the Feb. 27th dance, nor offer Corrina any accommodation that would allow her to attend school events without being harassed.

92.     At Corrina's request, Ms. Stefonetti inquired with the Scranton School District about the possibility of allowing Corrina to retake Algebra I over the summer. The district did not have a policy to accommodate homebound students who needed to take summer courses.

93.     After numerous requests by Ms. Stefonetti to Supervisor Carr and Assistant King to put a policy in place that would allow Corrina to receive a homebound instructor over the summer to teach her Algebra I, Assistant King agreed to allow Corrina to be taught the course over the summer by a homebound instructor. However, Ms. Stefonetti and Corrina

were given the responsibility of locating a Scranton School District math-certified instructor to teach Corrina.

94.     Ms. Stefonetti located Leeta Dennebaum, a math instructor certified by the district, to teach Corrina Algebra I.

95.     Corrina passed Algebra I over the summer.

96.     On June 15, 2007, Corrina was taunted and threatened at a picnic by a group of girls, including Scranton High School student Sandy Schultz. A police officer who intervened charged Sandy with making terroristic threats against Corrina.

97.     On August 27, 2007, Corrina returned to Scranton High School for her senior year.

98.     Prior to the first day of school, Ms. Bentler called Head Guidance Counselor McNulty to inform her that Corrina would begin attending classes at the school again.

99.     Rather than taking this opportunity to offer to evaluate Corrina or offer her accommodations to transition back into the school environment, Head Guidance Counselor McNulty instead asked Ms. Bentler what she had done to prepare Corrina to go back to school.

100.    On August 27th, Corrina was almost immediately confronted by a group of the same girls who had previously harassed her. They began

taunting her and obstructed her path as she tried to walk through the school's hallways.

101.    Corrina reported the harassment to the hall monitor, Ronal Barrett, who was supposed to notify Principal McGraw. Principal McGraw was in turn supposed to notify Assistant King.

102.    At lunch, Corrina was confronted by Sandy and a group of her friends. Sandy remarked to her friends, "there's the psychotic bitch"

103.    Corrina reported this event to Mr. Barrett.

104.    Fearing for her safety, Corrina did not return to class after August 27th.

105.    On August 29, 2007, Ms. Bentler called Principal McGraw to report that Corrina was again being harassed on the basis of her disability. Ms. Bentler told him that the same girls who harassed Corrina the previous year were taunting her and would not let her walk through the school unobstructed. She also told him that Magistrate Kennedy ordered Sandy to stay away from Corrina and that, despite Magistrate Kennedy's order, Sandy confronted Corrina at lunch and called her a "psychotic bitch."

106.    Principal McGraw responded by saying that he was not told that Corrina was being harassed and that he was in the lunchroom and did not hear anyone call her a "psychotic bitch."

107.     At no point did Principal McGraw ask for the names of the students who were harassing Corrina so that he could discipline them. Future calls to him were not returned.

108.     Furthermore, Principal McGraw failed to refer Corrina for an evaluation or provide her with any reasonable accommodation that would have allowed her to attend school without being harassed.

109.     On or around August 29, 2007, Ms. Bentler spoke with Supervisor Carr to request that Corrina receive Ms. Stefonetti as a homebound instructor for senior year. Ms. Bentler and Corrina both felt that Corrina would perform best with Ms. Stefonetti as her instructor because she had educated herself on Corrina's disability and the two had a solid working relationship.

110.     Supervisor Carr objected to Ms. Bentler's request, stating that the school does not want a student getting "used to" a homebound instructor.

111.     Ms. Bentler then called Assistant King with the same request.

112.     Assistant King refused Ms. Bentler's request, telling her she was expecting too much in requesting a specific homebound instructor.

113.     After multiple requests, Ms. Stefonetti was assigned to instruct Corrina in mid-to-late September.

114.    In mid-to-late October, Corrina was assigned an art course. Head Guidance Counselor McNulty told Ms. Bentler that Corrina needed to take the art course to graduate. However, Corrina did not actually need that credit to graduate and Ms. Stefonetti is not qualified to teach that subject.

115.    Ms. Stefonetti made numerous requests to Head Guidance Counselor McNulty for Corrina's art assignments. However, Corrina was not provided with any art assignments, including her first quarter work, until early November.

116.    Because of the difficulty of the art assignments, the inability of Ms. Stefonetti to assist Corrina with them, and the delay in receiving the assignments, Corrina's depression and anxiety worsened, as did her relationship with her mother.

117.    Dr. Berger diagnosed Corrina with an anxiety disorder and prescribed Klonopin, an anti-anxiety medication, for her.

118.    On December 6, 2007, Head Guidance Counselor McNulty informed Ms. Bentler that Corrina did not need the art class to graduate, despite her frequent assertions to the contrary.

119.    On or around December 6, 2007, Head Guidance Counselor McNulty excused misplacing Corrina in art to Ms. Stefonetti by saying, "anyway, if she can't do the art, how is she going to handle art in college?"

120.    In or around the same time, after repeated failed attempts by Corrina to be told Scranton High School's SAT code by the guidance office, Ms. Stefonetti requested the SAT code for Corrina from Head Guidance Counselor McNulty.

121.    Head Guidance Counselor McNulty sighed and responded "well, if she ever makes it to college…"

122.    Head Guidance Counselor McNulty also informed Ms. Stefonetti that Corrina would need to notify every school she applied to that she was a homebound student. However, Ms. Stefonetti has instructed numerous senior homebound students and has never been told to tell her students that before.

123.    Furthermore, in retaliation for Ms. Bentler's frequent attempts to advocate on behalf of her daughter, the SSD did not send Corrina's transcripts to the colleges she applied for, although it did so for the rest of the graduating class.

124.    Corrina was not provided with any information regarding senior year activities that she would otherwise be able to participate in.

125.    Corrina graduated from Scranton High School on June 19, 2008.

126.    While Corrina was able to succeed educationally, she was denied an evaluation, reasonable accommodations, and was subject to harassment in violation of her federally protected rights.

## COUNT I – 29 U.S.C. § 794 AND 42 U.S.C., § 12132 et seq.
### (Plaintiff Weidow v. SSD)
### (REHABILITATION ACT, AMERICANS WITH DISABILITIES ACT)

127.    Plaintiff incorporates paragraphs 1 through 126 as though each were set forth in their entirety.

128.    Title II of the ADA prohibits any local government or department thereof from denying the benefits of their services or discriminating against any person with a disability.

129.    Defendant SSD is a local government entity within the meaning and purview of Title II of the ADA.  It is a recipient of "federal financial assistance" as defined by the Rehabilitation Act.

130.    Defendant violated Corrina's federally guaranteed right to be free from discrimination on the basis of disability by failing to train and/or supervise its employees concerning the needs of students with disabilities such as Corrina, by failing to identify and evaluate Corrina as a student with a disability under § 504 of the Rehabilitation Act, or under IDEA, and by

failing to establish or implement adequate policies, practices or procedures to accommodate students with mental disabilities such as Corrina.

131. Defendant's conduct, as described above, amounts to intentional discrimination on the basis of disability.

**132.** As a direct and proximate result of defendant's conduct, Corrina has suffered, and will continue to suffer damages including but not limited to, general damage, emotional distress, humiliation, embarrassment, and loss of enjoyment of life's pleasures.

### COUNT II – 29 U.S.C. § 794 AND 42 U.S.C. § 12132 et seq.
### (Plaintiff Weidow v. SSD)
### (REHABILITATION ACT, AMERICANS WITH DISABILITIES ACT)
### (Peer-on-Peer Harassment)

133. Plaintiff incorporates paragraphs 1 through 132 as though each were set forth in their entirety.

134. As described herein, Corrina was continually harassed by other students of SSD because of her mental disability.

135. The harassment was continuous throughout her high school years, thereby making it sufficiently severe and pervasive as to alter her educational environment by, among other things, forcing her to change schools, making her physically ill such that she would miss school, and

ultimately forcing her mother to place her on homebound instruction because SSD offered her no alternative.

136.    SSD was aware of the hostile educational environment resulting from the peer-on-peer harassment that Corrina was subjected to.

137.    Defendant violated Corrina's federally guaranteed right to be free from discrimination on the basis of disability by failing to meaningfully and promptly investigate the peer-on-peer disability-based harassment and by failing to take appropriate and effective remedial measures to end the harassment.

138.    Defendant's conduct, as described above, amounts to deliberate indifference and intentional discrimination on the basis of disability.

139.    As a direct and proximate result of defendant's conduct, Corrina suffered, and will continue to suffer the damages alleged herein and are entitled to relief.

### COUNT III – 42 U.S.C. § 1983
### (Plaintiff Weidow v. SSD)
### (VIOLATION OF EQUAL PROTECTION – class of one)

140.    Plaintiff incorporates paragraphs 1 through 138 as though each were set forth in their entirety.

141.    Plaintiff Corrina Weidow constitutes a "class of one" for purposes of a 14th Amendment, Equal Protection violation.

142. Through the unlawful conduct described herein, she was treated differently than other similarly situated students.

143. Defendant's conduct was intentional and arbitrary.

144. There was no rational basis for defendant's treatment of Corrina.

145. As a direct and proximate result of this treatment, Corrina suffered the damages alleged herein and is entitled to relief.

### COUNT IV – LIBERTY INTEREST
### (Plaintiff Bentler v. SSD)
### (14th Amendment)

146. Plaintiff Kerry Bentler incorporates paragraphs 1 through 144 as though each were set forth in their entirety.

147. Plaintiff Bentler has a fundamental right to care for and guide her daughter Corrina. This includes providing care and guidance related to her education.

148. As a result of defendant's conduct alleged herein, Kerry Bentler has been deprived of this fundamental, protected liberty interest.

149. There was no compelling government interest for defendant's unlawful conduct.

150. As a result of the deprivation of this fundamental, protected liberty interest, plaintiff Benter has suffered damages and is entitled to relief.

WHEREFORE, Plaintiffs demand trial by jury and:

A. Damages for economic losses and compensatory damages;

B. Punitive and exemplary damages as permitted by law against

defendant;

C. Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and federal

law; and

D. Such other equitable and non-equitable relief as this Court deems

just and equitable.

Respectfully submitted,

BY:

STEPHEN S. PENNINGTON, ESQUIRE
JAMIE C. RAY, ESQUIRE
One Penn Center at Suburban Station,
Suite 800
1617 J.F.K. Boulevard
Philadelphia, PA 19103
(215) 564-2363

Attorneys for Plaintiffs

Dated:  October 30, 2008

```
                                ... ...  ....
... ... ...       ...  ...  ....
... ...
number Account: 3220937...
Cashier ID: langeli
Transaction Date: 03/31/2008
Payee Name: STEPHEN S. PENNING... ...Cashi..

... ...       ...  ...  ... ...
CIVIL FILING FEE
For: STEPHEN G. PENNINGTON [PRO SE]
Case/Party: D-PAM-3-08-CV-001978-I..
Amount:          $350.00

... ...       ...  ...  ... ...
Check
Check/Money Order Num: 1...
Amt Tendered: $350.00

... ... ... ... ... ... ... ...
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


... when ...   ... ... ... ... ...
... ...  plus a $... fee to ...
or other ... ... may be ...
discharged, a $35.00 fee will be
charged for returned checks.
```