# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORRINA WEIDOW and KERRY BENTLER, | CIVIL ACTION NO. 3:08-CV-1978 |
| Plaintiffs, | (JUDGE CAPUTO) |
| v. | |
| SCRANTON SCHOOL DISTRICT, | |
| Defendant. | |

## **MEMORANDUM**

Corrina Weidow brought this action against Scranton School District. She alleges that when she was a high school student the school district discriminated against her on the basis of her bipolar disorder and treated her differently from others similarly situated in violation of the Equal Protection Clause.[1] Presently before the Court is the defendant's motion for summary judgment. (Doc. 30.) Because Ms. Weidow has failed to show that she is an individual with a disability or that she faced intentionally different treatment, the motion will be granted.

## I. Background

The general background of this case has been explained in the Court's August 19, 2009 Order. (Doc. 13.)

---

[1] Ms. Weidow's mother also brought a due process claim at Count IV of the complaint, which was dismissed on July 19, 2009.

1

In her complaint, Ms. Weidow alleges that she suffers from bipolar disorder and has a disability. At Count I, she brings a claim under the Americans with Disabilities Act and the Rehabilitation Act, alleging that the school district discriminated against her by failing to train or supervise its employees regarding their treatment of disabled students and by failing to effectively accommodate students with mental disabilities. At Count II, she claims that the district's deliberate indifference to the harassment she faced from her peers resulted in a hostile educational environment and constituted intentional discrimination. At Count III, Ms. Weidow brings a "class of one" equal protection claim, alleging that the district treated her differently from other students without any rational basis.

The district moves to dismiss these claims on summary judgment. The motion is fully briefed and ripe for disposition.

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual

dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B. Disability Discrimination Claims**

The school district argues that it is entitled to judgment as a matter of law on the

3

disability discrimination claims because the plaintiff has not shown that she has a disability, or that the district discriminated against her.

Ms. Weidow brought two claims relating to disability discrimination: one relating to the district's alleged failure to accommodate her, and another relating to deliberate indifference towards peer harassment. Both claims were brought under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA). Both statutes prohibit certain public entities from discriminating against otherwise qualified individuals on the basis of disability. Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...

29 U.S.C. § 794(a).

Under Title II of the ADA, state and local public entities are prohibited from discriminating against individuals with disabilities. The relevant provision provides in part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. "Congress has directed that Title II of the ADA be interpreted in a manner consistent with Section 504 . . . and all the leading cases take up the statutes together." *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997). The primary difference between a disability discrimination claim under the ADA and one under the Rehabilitation Act is that a claim under the ADA does not need to allege that the offending program receives federal financial assistance.

To make out a prima facie case of disability discrimination, Ms. Weidow must first

4

establish that she has a disability. *See Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337. 350 (3d Cir. 2007).

At the time this claim arose, disability was defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1) (2000); 29 U.S.C. § 705(20)(B). The implementing regulations note that "major life activities" are those of central importance to daily life and include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(1). The Supreme Court has noted that a disability substantially limits a major life activity when the individual is

> unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195–96 (2002) (citing 29 C.F.R. 1630.2(j)(2)).[2]

In line with *Toyota*, as well as the EEOC implementing regulations, courts should consider the following factors in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

---

[2] Congress overruled *Toyota* to the extent that it held that mitigating measures must be considered in evaluating whether an individual is disabled by its ADA Amendments Act of 2008. The amendments are not relevant here, because Ms. Weidow fails to show that she is substantially limited in a major life activity even in the absence of mitigating measures. Therefore, it is not necessary to decide whether or not the amendments are retroactive. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 & n.5 (3d Cir. 2010).

5

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). "Transitory, temporary or impermanent impairments are not considered an impairment that substantially limits a major life activity." *Seibert v. Lutron Elec.*, No. 10-1091, 2010 WL 4780370, at *2 (3d Cir. Nov. 24, 2010) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002); *McDonald v. Com. of Pa., Dep't of Pub. Welfare*, 62 F.3d 92, 94-97 (3d Cir. 1995)). The plaintiff bears the burden of establishing she has a disability. *Marinelli v. City of Erie*, 216 F.3d 354, 359 (3d Cir. 2000).

The district claims that Ms. Weidow fails to introduce evidence that creates a triable issue as to whether she is disabled. It is undisputed that Ms. Weidow has been diagnosed with bipolar disorder, which is a mental impairment. Therefore, the district must hang its argument on Ms. Weidow's failure to raise an issue of material fact as to whether her impairment substantially limits one or more of her major life activities.

The paramount inquiry is whether a rational fact-finder could agree that Ms. Weidow "ha[s] an impairment that prevents or severely restricts her from doing activities that are of central importance to most people's daily lives." *See Emory v. AstraZeneca Pharm. LP*, 401 F.3d 174, 180-81 (ed Cir. 2005) (quoting *Toyota*, 534 U.S. at 197). Ms. Weidow points to four major life activities which she alleges her impairment substantially limits: interacting with others, caring for self, concentrating, and sleeping. Each of these major life activities will be considered in turn.

**1. Interacting With Others**

Although the Third Circuit has not directly held that interacting with others is a major life activity, other circuit courts have done so. *See Jacques v. Dimarzio, Inc.*, 386 F.3d 192,

202 (2d Cir. 2004) (holding that interacting with others is a major life activity); *McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999), *amended by* 201 F.3d 1211 (9th Cir. 2000) (same). Courts have noted that a plaintiff cannot establish a substantial limitation in interacting with others unless she shows "that h[er] relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 499 (10th Cir. 2000) (citing the court's holding in *McAlindin*, 192 F.3d at 1235).

Here, Ms. Weidow argues that her deposition testimony demonstrates that she is substantially limited in social interactions. However, the cited testimony does not discuss any limitations on her social interactions caused by her mental impairment. Instead, the testimony simply shows that her peers' behavior caused her distress. One excerpt is illustrative:

> **Q.** What impact do you think the [peer] harassment has had on your experience at [college]?
>
> **A.** I kind of stay away from people. I don't really trust anybody. I don't want anybody to know about my illness. I feel like I'm judged upon it. I just keep to myself and do my school work and go home.

(Pl.'s Dep. at 110; Doc. No. 39-1, Ex. A.) Nobody likes harassment, and the plaintiff's reaction to the alleged constant teasing and threats she faced is understandable. However, self-isolation in response to peer harassment does not establish that Ms. Weidow's bipolar disorder impaired her interactions with others. To be disabled under the ADA or Section 504, the substantial limitation of a major life activity must result from the impairment, not from the individual's (natural) response to harassment caused by the impairment. Although Ms.

7

Weidow alleges that her peers *targeted her* because of her bipolar disorder, this does not establish that her bipolar disorder impaired her own social interactions. If anything, Ms. Weidow's allegations prove that *her peers* suffered from an impaired social ability, as evidenced by their cruel taunts. Although her deposition testimony reflects that her relationships were affected, it does not show substantial limitations:

> **Q.** What aspects of your life does [the bipolar illness] affect?
>
> **A.** It affects how I pick and choose my friends, relationships. It affects the way I – like I can be naive. My – like my behavior, like, around others, like, if I'm manic or if I'm depressed, my moods. It just affects my – my life.

(Pl.'s Dep. at 113; Doc. 39-1, Ex. A.) Undoubtedly, Ms. Weidow's mental and emotional make-up affects how she chooses her friends, her relationships, her behavior, and her moods. The same is surely true for most individuals; however, such overarching and vague effects on interaction do not suffice to show a substantial limitation.

Ms. Weidow also points to the report of her treating psychiatrist. This report refers briefly to the presence of symptoms of irritability and anger outbursts. The report, however, fails to explain the severity of these symptoms or suggest that they substantially limit her interactions with others. In fact, the report strongly suggests that Ms. Weidow's peer isolation resulted from the harassment and subsequent period of homebound instruction, and *not* from her mental impairment.

Moreover, the record evidence shows that Ms. Weidow did have friends. She had a best friend during her time at West Scranton High School, and following her transfer to Scranton High School she "was still friends with the people from West, but [ ] made more friends at Scranton." (Pl.'s Dep. at 36; Doc 390-1, Ex. B). Although her relationships with some of her former friends deteriorated, this happened because of disputes over boys and

8

*not* due to any social *faux pas* on Ms. Weidow's part. (*Id.* at 21, 46, 47.) When asked who her closest friends were, Ms. Weidow responded with the names of seven individuals, explaining that "[t]hey're my closest ones. And then I have a lot of acquaintances, that I just hang out with." (*Id.* at 93.) In the evenings, she sometimes socializes with her friends. Her mother reported that she "always had some friends." (Bentler Dep. at 13; Doc. 39-1, Ex. B.) Her description of her own social life is not one characterized by severe problems.

It is unfortunate that Ms. Weidow was singled out for harassment by some of her classmates. It is even more unfortunate that this harassment frequently consisted of slurs and insults referencing her bipolar condition. In some general sense, being targeted in this manner limits her social interactions and stigmatizes her because of her mental impairment. However, allowing the cruelty of others to enter the analysis of whether one is substantially limited in social interaction would run afoul of the statutory definition of disability, which requires that the impairment limit an activity *of the individual.* In other words, her impairment must limit or impair *her own* social behavior—not that of her peers. *See* 42 U.S.C. § 12102(1). Nothing in the record suggests that Ms. Weidow's social behavior substantially limited her ability to interact with others, and any withdrawal appears to have resulted from her harassment and home-bound instruction, and not from her bipolar disorder.

**2. Caring for Oneself**

Ms. Weidow also argues that she is substantially limited in the major life activity of caring for herself. Other courts have held that caring for one's self "encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning home." *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 767 (10th Cir. 2006) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 47 (2d Cir. 2002); *see*

*also Marinelli v. City of Erie*, 216 F.3d 354, 362 (3d Cir. 2000); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995).

Here, Ms. Weidow's deposition testimony indicates the harassment caused feelings of worthlessness, and that "[she] got to the point where [she] was so depressed that all I would do was lay in bed . . . I felt like the world turned its back on me." (Pl.'s Dep. at 111–12; Doc. 39-1, Ex. A.) However, this evidence does not raise an inference of substantial limitation caused by her impairment for two reasons. First, her condition is described as transitory ("I got to the point . . ."). Second, her melancholy is framed as a response to the harassment, instead of as a symptom resulting from her bipolar condition. No record evidence suggests that Ms. Weidow's *mental impairment* caused substantial limitations in any normal activities of daily living, such as grooming, eating, preparing food, or getting dressed.

Ms. Weidow also asserts that her self-injurious behavior substantially limited her ability to care for herself. The record shows that Ms. Weidow cut herself on occasion between the eighth grade and November 2004, (Bentler Dep. at 10, 19; Doc. 39-1, Ex. B), which is bolstered by her psychiatrist's report, (Doc. 39-1, Ex. C ("Patient had . . . engaged in self mutilation in the form of superficial cutting to the arms and legs when she felt angry and sad.")). There is also evidence[3] of an incident at a dance her junior year where Ms. Weidow scratched her own shoulders during a panic attack, drawing blood. (Bentler Dep. at 79; Doc. 39-1 Ex. B.) While self-mutilation certainly runs counter to proper care of

---

[3] The source of this information is Ms. Weidow's mother, who was not testifying about the scratching on the basis of personal knowledge. However, the mother saw the scratches when her daughter came home, and viewing this fact in the light most favorable to the plaintiff, an inference can be made that Ms. Weidow scratched herself.

oneself, there is no evidence of its duration, severity, frequency, or permanence in this case. By *themselves*, these incidents of self-injurious behavior could not lead a reasonable juror to find that Ms. Weidow is substantially limited in the major life activity of caring for herself.

**3. Concentrating**

Concentrating, as an aspect of cognitive function, is a major life activity. *See Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565, 569 (3d Cir. 2002).

Ms. Weidow's deposition testimony indicated that at times she would get confused[4] or have a racing mind and inability to focus. She claims that this testimony shows that her ability to engage in the major life activity of concentrating is substantially limited. The relevant deposition testimony reads as follows:

> **Q.** When you were at Scranton High School, did the harassment that we talked about have any impact on your ability to study?
>
> **A.** Sometimes.
>
> **Q.** What impact would it have?
>
> **A.** My mind would be racing, and I wouldn't be able to focus.

(Weidow Dep. at 114; Doc. 39-1 Ex. A.) This testimony, however, suggests that Ms. Weidow's racing mind and lack of focus resulted from the harassment. It does not show that her bipolar condition impaired her concentration.

Her psychiatrist's report notes that "[d]uring depressive episodes it is not uncommon for Corrina to become somewhat impaired with regards to her concentration, her focus, and

---

[4] This reference does not show that Ms. Weidow was confused in general. Her testimony was that she would hear [a voice] in her head "[e]very time that I felt like I was going into like a depression or if I was getting confused with a subject or having a hard time with homework or tests." (Weidow Dep. at 107-08; Doc. 39-1 Ex. A.) This testimony does nothing other than show that, at times, Ms. Weidow experienced confusion with a subject–an experience that is near-universal, and in no way suggests a substantial limitation.

11

her ability to maintain pace and concentration for significant periods of time." (Berger Rep. at 4; Doc. 39-1 Ex. C .) To survive summary judgment, Ms. Weidow must introduce evidence from which a rational juror could find that her concentration is "significantly restricted" in comparison to the "condition, manner or duration under which the average person in the general population" can concentrate. *See* 29 C.F.R. § 1630.2(j). Here, the psychiatrist's report refers to bouts of being "somewhat" impaired. The report fails to describe the frequency of Ms. Weidow's loss of concentration, or its duration, severity, or impact. The report does not reveal whether her impairment is *substantial* when compared to the general population, or merely represents a lowering of her baseline concentration when not depressed. Viewing the report's conclusory assertion in the light most favorable to Ms. Weidow, no rational juror could find that Ms. Weidow's concentration was substantially limited in comparison to an average person's concentration.

The plaintiff has failed to present facts that, when viewed in her favor, show that she is substantially limited in the major life activity of concentrating.

**4. Sleeping**

Finally, Ms. Weidow alleges that she suffers substantial limitations in sleeping. For support, she points to her psychiatrist's report. The report simply notes that Ms. Weidow came under Dr. Berger's care in May of 2004, and at that time presented with a "sleep disturbance." This bare statement, without any description of the ways in which Ms. Weidow's sleep suffers in comparison to the average person's, does not create a triable issue on whether she is substantially limited in sleeping. She has failed to meet her burden of introducing sufficient evidence from which a rational trier could find that her impairment substantially limits her sleeping.

12

**5. The Plaintiff is Not Disabled within The Meaning of the ADA**

Ms. Weidow has failed to meet her burden and show that she is substantially limited in any major life activity. In her opposition to the school district's motion for summary judgment, she does not argue that she qualifies as disabled under the "having a record of such an impairment" or the "being regarded" prongs of the disability definition. Therefore, she has failed to show that she has a disability, and her disability discrimination claims cannot survive summary judgment in favor of the school district. Because she has failed to establish this first element of her prima facie case, it is not necessary to consider whether the school district discriminated against her.

**C. Class of One Equal Protection Claim**

Ms. Weidow brought a "class of one" equal protection claim, alleging that the school district treated her differently from other students. The school district moves for judgment as a matter of law in its favor on this claim, arguing that Ms. Weidow has failed to produce evidence that she was treated differently from similarly situated students.

To bring a "class of one" equal protection claim, a plaintiff must show that she has been intentionally treated differently from others similarly situated, and that no rational basis explains the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster City*, 448 U.S. 336 (1989)).

In support of her claim, Ms. Weidow points to several portions of the record. First, she cites her own deposition testimony that she was placed in an ESL class that was taught at a slower pace on account of her bipolar disorder. However, this evidence does not show that she was treated differently from others similarly situated: her own deposition testimony

13

shows that another English-speaking boy in the ESL class had bipolar disorder. (Weidow Dep. at 42-43; Doc. 30-3 Ex. A.) Additionally, nothing suggests that her placement in the class was intentional; her own testimony shows that the placement was accidental and that she was removed from the class after she complained. (Weidow Dep. at 42; Doc. 30-3 Ex. A.) Viewed in the plaintiff's favor, her quickly-rectified placement in an ESL classroom does not show intentionally different treatment from others similarly situated.

Ms. Weidow additionally points to portions of the record[5] in which the school district's director of special education describes the process by which students are evaluated for accommodations, a guidance counselor testifies that her own daughter was identified as a student with a disability and given an individualized education program, and a homebound teacher represents that she worked with bipolar students who received special education services and accommodations. Ms. Weidow argues that this evidence shows the school district treated her differently by failing to treat her like other students with bipolar disorder.

However, the record suggests that although her mother made general requests for help, neither Ms. Weidow nor her mother ever made a written request for special education services or made a referral for a Section 504 plan. (Bentler Dep. at 28, 29, 51, 52, 67–69, 81, 89, 90, 107–115; Doc. 39-1 Ex. B.) Thus, to show different treatment under a "class of one" theory, Ms. Weidow would have to show evidence that the school district affirmatively gave accommodations and special education to other high school students who have bipolar disorder, and whose parents had not referred them for evaluations. She has not done so, and therefore has failed to show that she was treated differently from others similarly

---

[5] In her brief, Ms. Weidow cites to pages 10-11 of the deposition of Lee Carr, the director of special education. Ms. Weidow failed to submit these pages, however, so they are not considered.

situated.

Furthermore, the plaintiff points to no evidence suggesting that any different treatment or failure to accommodate was *intentional*. For this reason, too, she fails to meet her burden under a "class of one" theory.

Ms. Weidow has not offered sufficient evidence in her favor to forestall summary judgment on her "class of one" equal protection claim. Therefore, summary judgment in favor of the school district is appropriate.

### III. Conclusion

As discussed above, Ms. Weidow has failed to introduce sufficient evidence from which a rational juror could find that she is disabled within the meaning of the Americans with Disabilities Act. Therefore, the school district's motion for summary judgment in its favor on her disability discrimination claims at Counts I and II of the complaint will be granted. Ms. Weidow has also failed to introduce evidence from which a rational trier, viewing it in the light most favorable to Ms. Weidow, could find that she was intentionally treated differently from others similarly situated without a rational basis. Therefore, summary judgment in favor of the school district on the "class of one" equal protection claim at Count III is appropriate.

An appropriate order follows.

January 13, 2010 /s/ A. Richard Caputo
Date  A. Richard Caputo
 United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORRINA WEIDOW and KERRY BENTLER, | |
| Plaintiffs, | NO. 3:08-CV-1978 |
| v. | (JUDGE CAPUTO) |
| SCRANTON SCHOOL DISTRICT, | |
| Defendant. | |

**ORDER**

**NOW**, this 13th day of January, 2011, **IT IS HEREBY ORDERED** that:

(1) Defendant Scranton School District's motion for summary judgment (Doc. 30) is **GRANTED**.

(2) Judgment shall be entered in favor of the defendant and against the plaintiff.

(3) The clerk of court is directed to mark this matter **CLOSED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge